# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**DANIEL AND BARBARA RYAN,**
**Individually and on behalf of similarly**
**situated persons**

**CIVIL CASE NUMBER: _____**

**VERSUS**

**NATIONAL FOOTBALL LEAGUE, INC,**
**ROGER GOODELL, WILLIAM**
**VINOVICH, III, PATRICK TURNER,**
**GARY CAVALETTO, AND**
**ALBERTO RIVERON**

**JUDGE: _____**

**MAGISTRATE: _____**

**JURY TRIAL DEMANDED**

---

## ORIGINAL COMPLAINT FOR DAMAGES
## AND DEMAND FOR CLASS ACTION RELIEF

NOW INTO COURT, through undersigned counsel, comes the Plaintiffs, DANIEL AND BARBARA RYAN, competent persons of the age of majority who is domiciled in the Parish of Orleans, State of Louisiana who individually and as representatives of a class of similarly situated persons seeks damages and relief as set forth herein:

### PARTIES

### 1.

**Plaintiffs:**

A.     **DANIEL AND BARBARA RYAN,** Individually and on behalf of similarly situated persons to include all persons who purchased a ticket to attend the National Football League Game between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 said game designated as the National Football Conference (NFC) Championship game to determine the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world wide marketed championship game known as the "SUPER BOWL".

**Defendants:**

B.    **The NATIONAL FOOTBALL LEAGUE, INC.** (hereinafter referred to as the "**NFL**") a foreign corporation which regularly transacts business in the State of Louisiana and within Orleans Parish whose principal place of business is located at 345 Park Avenue, New York, New York who is sued in their individual capacity and as employers of the defendants, Roger Goodell, William Vinovich, III, Patrick Turner and Gary Cavaletto;

C.    **ROGER GOODELL** (hereinafter referred to as "**GOODELL**"), a competent person of the age of majority who upon information and belief is domiciled in Bronxville, New York in his capacity as the COMMISSIONER of the NATIONAL FOOTBALL LEAGUE, INC. who upon information and belief at all times herein was employed by the NATIONAL FOOTBALL LEAGUE, INC. who is authorized and empowered to act as the Chief Executive on their behalf;

D.    **WILLIAM VINOVICH, III**, (hereinafter sometimes referred to as "**VINOVICH**" and/or together with defendants PATRICK TURNER and GARY CAVALETTO collectively referred to as the subject officials) a competent person of the age of majority who upon information and belief is domiciled at 412 Fawn Park Circle, Council Bluffs, Iowa 51502, who at all times pertinent herein was acting in the course and scope of his employment with the defendant, The NATIONAL FOOTBALL LEAGUE, INC. as the Referee for the National Football League Game between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 said game designated as the National Football Conference (NFC) Championship game to determine the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world-wide marketed championship game known as the "SUPER BOWL";

E.    **PATRICK TURNER** (hereinafter sometimes referred to as "**TURNER**" and/or together with defendants WILLIAM VINOVICH, III and GARY CAVALETTO collectively referred to as the subject officials) a competent person of the age of majority who upon information and belief is domiciled in Lake Wood, California, who at all times pertinent herein was acting in the course and scope of his employment with the defendant, The NATIONAL FOOTBALL LEAGUE, INC. as a Down Judge for the National Football League Game between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 said game designated as the National Football Conference (NFC) Championship game to determine the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world-wide marketed championship game known as the "SUPER BOWL";

F.    **GARY CAVALETTO** (hereinafter sometimes referred to as "**CAVALETTO**" and/or together with defendants WILLIAM VINOVICH, III and PATRICK TURNER collectively referred to as the subject officials) , a competent person of

the age of majority who upon information and belief is domiciled AT 1100 Del Ray, Goleta, California 93117, California, who at all times pertinent herein was acting in the course and scope of his employment with the defendant, The NATIONAL FOOTBALL LEAGUE, INC. as a Side Judge for the National Football League Game between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 said game designated as the National Football Conference (NFC) Championship game to determine the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world-wide marketed championship game known as the "SUPER BOWL"; and

G.     **ALBERTO RIVERON** (hereinafter sometimes referred to as "RIVERON") a competent person of the age of majority who upon information and belief resides and is domiciled in Miami, Florida, who at all times pertinent herein was acting in the course and scope of his employment with the defendant, THE NATIONAL FOOTBALL LEAGUE, INC. as the Senior Vice President of Officiating between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 said game designated as the National Football Conference (NFC) Championship game to determine the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world-wide marketed championship game known as the "SUPER BOWL".

## II.
## JURISDICTION

2.

This Honorable Court has original jurisdiction over these proceedings pursuant to 28 U.S.C. §1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and the parties are citizens from different states as plead herein. This Honorable Court has supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution pursuant to 28 U.S.C. §1367.

3.

This Honorable Court has personal jurisdiction over the non-resident defendants in that the defendants regularly transact business in this state, contracts to supply services or things in this state, solicits business, engages in a persistent course of conduct and derives revenue from goods

used and services rendered in this state and caused injury and/or damage by an offense or quasi offense committed through an act or omission in this state and caused injury and/or damage by an offense or quasi offense committed through an act or omission outside of this state.

**III.**
**VENUE**

4.

The United States District Court, Eastern District of Louisiana is a Court of proper venue in that it is the jurisdiction in which a substantial part of the events or omissions giving rise to the claim occurred as plead herein pursuant to 28 U.S.C. §1391.

**IV.**
**FACTS**

5.

The National Football League is a professional American football league consisting of 32 teams that is equally divided into two conferences, the American Football Conference and the National Football Conference. Each conference is divided into four division consisting of the East, North, South and West Conferences.

6.

Each team in the National Football League is scheduled to play 16 games against various opponents during the regular season. Standings are kept tracking the wins and losses of each team. Based upon the standings the winner of each division and two "wild card teams" in each respective conference compete in a playoff system to determine a conference champion. Winning a Conference Championship conveys prestige, pride and financial reward for the team, the city, the state and their fans.

7.

The football game that is the subject of this lawsuit was to determine the National Football Conference Champion between the New Orleans Saints and the Los Angeles Rams on January 21, 2019 (hereinafter referred to as "THE GAME"), at the Mercedes Benz Superdome (hereinafter identified as "the Superdome") located in New Orleans, Louisiana in Orleans Parish.

8.

The Superdome has an approximate seating capacity of 73,000. Based upon information and belief therein, there were 73,028 in paid attendance at THE GAME which included the plaintiff and those plaintiffs similarly situated.

9.

The winner of THE GAME was designated as the National Football Conference (NFC) Champion and the NFC representative in the NATIONAL FOOTBALL LEAGUE, INC.'s world-wide marketed championship game known as the "SUPER BOWL" to be played on February 3, 2019. Season ticket holders qualify for participation in a "SUPER BOWL" ticket lottery providing for access to "SUPER BOWL" tickets.

10.

The winner of the Super Bowl is designated as the Champion of the NFL for that season and receives all the prestige, accolades and financial rewards that the title bestows upon the winning team, their owner, their players, their employees, their fans, their city and their state.

11.

The NFL represents to the general public, its fans, including the plaintiffs that the organization and the officials that are employed to officiate the NFL games, including THE GAME

are part of the superior product they offer and are "…carefully selected, extensively prepared and rigorously evaluated to ensure that they call games correctly and consistently. This process results in outstanding officiating that players, coaches and **fans expect and deserve**."[1]

12.

Upon information and belief therein, the officials, employed by the NFL, who were assigned to officiate THE GAME included Rusty Baynes, Bruce Stritesky, William Vinovich, III, Tom Hill, Gary Cavaletto, Todd Prukop and Patrick Turner.

13.

Each official is given a specific title for the game that sets forth that official's duties, responsibilities, authority and their location on the field at the time of play.

14.

At all times pertinent herein, the defendant, **VINOVICH** was employed by the NFL and was acting in the course and scope of his employment and was designated as the referee for THE GAME. As the referee he is the crew chief, leader of the officiating crew, oversees everything related to the officials, maintains the pace of the game, signals all fouls and has final authority on all disputed rulings.[2]

15.

At all times pertinent herein, the defendant, **TURNER** was employed by the NFL and was

---

[1] National Football League Operations website: https://operations.nfl.com/the-officials/these-officials-are-really-good/

[2] National Football League Operations website: https://operations.nfl.com/the-officials/these-officials-are-really-good/officials-responsibilities-positions/

acting in the course and scope of his employment and was designated as a DOWN JUDGE (DJ) for THE GAME. As a Down Judge, his responsibilities included ruling on sideline plays on the nearest half of the field, monitoring receivers and defenders on nearest side of the field and watches for pass interference.[3]

16.

At all times pertinent herein, the defendant, **CAVALETTO** was employed by the NFL and was acting in the course and scope of his employment and was designated as a SIDE JUDGE (SJ) for THE GAME. As a Side Judge, his responsibilities included watching the widest receiver on the nearest side of the field for blocks, looking for illegal use of hands, holding or pass interference and watches the field for pass interference.

17.

At all times pertinent herein, the defendant, **RIVERON** was employed by the NFL and was acting in the course and scope of his employment and was acting as the Senior Vice President of Officiating and oversaw all aspects of the league's officiating department.

18.

The actions and inaction that give rise to the causes of action asserted herein occurred at or about 1:45 remaining on the game clock in the 4th quarter of THE GAME on a third-and-10 play from the Rams 13 yard line with the score 20-20.

---

[3] National Football League Operations website:
https://operations.nfl.com/the-officials/these-officials-are-really-good/officials-responsibilities-positions/

19.

At or about that time, the quarterback for the New Orleans Saints Football Team, Drew Brees threw a perfect accurate spiral pass along the right sideline to his intended wide receiver, Tommylee Lewis.

20.

At or about the same time, as the ball was approaching the intended receiver, Lewis, the Los Angeles Rams defender, Nickell Robey-Coleman ran towards Tommylee Lewis and impermissibly initiated helmet to helmet contact, pass interference and other fouls with the Saints receiver, Tommylee Lewis, and continued with contact ultimately violently knocking the receiver to the ground.

21.

The aforementioned contact initiated by the Los Angeles Rams defender, Nickell Robey Coleman and against the New Orleans Saints receiver Tommylee Lewis constituted pass interference per the National Football League Operations Manual in that[4]:

a.    It was illegal contact with a receiver committed beyond five yards from the line of scrimmage while the receiver was running a route while the quarterback remained in the pocket.

b.    It was an act committed more than one yard beyond the line of scrimmage that significantly hindered an eligible player's opportunity to catch the ball;

c.    It occurred from a forward pass that was thrown from behind the line of scrimmage

---

[4]Exhibit 1 - NFL Operations Manual - Rule 8 Sections (4)(5)

to an eligible receiver and the contact initiated by the Rams defender occurred while the ball was in the air and prior to the Saints receiver touching the ball;

d.   It was contact by the Rams defender who was not playing the ball that restricted the Saints receiver from an opportunity to make the catch;

e.   It cut off the path for the Saints receiver by making contact with him without the Rams defender playing the ball.

22.

In addition to pass interference, the Rams defender committed multiple personal fouls per the definition of the National Football Operations Manual endangering the safety and well-being of the Saints receiver that include the following[5]:

a.   The Rams defender initiated unnecessary contact against the Saints receiver who was in a defenseless posture Specifically, the Saints receiver was attempting to catch a pass and had not made the catch or have time to clearly become a runner and the Saints receiver was not capable of avoiding or warding off the impending contact.

b.   The Rams defender forcibly hit the defenseless Saints player's head or neck with his helmet and facemask.

c.   The Rams defender lowered his head and made forcible contact with the helmet of the defenseless Saints receiver.

d.   The Rams defender illegally launched himself into the defenseless Saints receiver

---

[5] Exhibit 1 - NFL Operations Manual Rule 12 Section 2 Article 7

by leaving his feet prior to contact to spring forward and into the Saints receiver and used his helmet to initiate forcible contact against the Saints receiver.

23.

In addition to the aforementioned fouls committed by the Rams defender, the Rams defender committed the most egregious personal foul recognized by the NFL and subject to the enforcement of the officials and the NFL Operations department in New York, New York while monitoring THE GAME, the illegal use of the helmet. Specifically, the Rams defender lowered his head to initiate and make contact with his helmet against the defenseless Saints receiver during the forward pass play.[6] This "non-call" is the most egregious as it does not allow for subjective assessment, discretion or interpretation. If helmet to helmet contact is initiated by a player then a foul must be called.

24.

In fact, the NFL's Rule Changes and Points of Emphasis for the 2018 season, including THE GAME, represented to its players, teams, owners, officials, and fans (including the subject plaintiffs) that particular emphasis was to be placed on player protection which resulted in the rule changes and points of emphasis to reduce and prevent injury. The most significant change for the 2018 season is the new Use of Helmet rule. The pertinent officiating standards for the Use of Helmet rule are:

· Lowering the head

· Initiating contact with the helmet to any part of an opponent. Contact does not have

---

[6] Exhibit 1 - NFL Operations Manual Rule 12 Section 2 Article 8

to be to an opponent's head or neck area - lowering the head and initiating contact to an opponent's torso, hips and lower body, is also a foul.

25.

In order to accomplish the player protection goals and to protect the integrity of the game the NFL represented to the players, teams, owners, officials and fans (including the subject Plaintiffs) that **illegal contact will be more strictly enforced this season** and that offensive and defensive **pass interference will also be strictly enforced**.

26.

The aforementioned fouls committed by the Rams defender are undisputed and irrefutable. The fouls were witnessed worldwide by everyone who was watching the play as it unfolded at the game, the press box, television and via internet, including, and most important of all, the subject officials officiating the game, VINOVICH, TURNER AND CAVALETTO, COMMISSIONER GOODELL and the Senior Vice President of Officiating, RIVERON.

  

The subject play was not subject to discretion, judgment and/or interpretation. Undeniably, the untrained eye and football novice witnessed, interference, illegal contact, illegal use of the helmet and multiple fouls committed upon a player in a defenseless posture all in clear violation of the rules as represented by the NFL to its players, teams, owners, officials and fans (including the subject Plaintiffs). In fact, the Rams defender not only admitted that he committed the fouls but took pride in doing so. Specifically when asked if he had committed pass interference and gotten away with it he responded "I did my part," he said with a smile and "Referee made the call.". Robey-Coleman went on to further declare that after the fouls he knew he had committed that he "came to the sideline, looked at the football gods, said thank you, he chuckled. "It is what it is." Later Robey-Coleman posted on his social media account proudly "I am going to get straight to the point about the call last night, obviously I smacked his ass...put that motherf#@!in waffle house frying pan."

The NFL, through RIVERON admitted that the subject officials ignored the fouls committed by the Rams defender that changed the outcome of the contest:

· Sean Payton stated in the press conference at the end of THE GAME that "I don't know if there was ever a more obvious pass interference call."

· Sean Payton also stated that "Just getting off the phone with the league office. They blew the call" and that the defendant, Senior Vice President of Officiating, Al Riveron told him that Bill Vinovich's officiating crew missed two calls on the play: the defensive pass interference and a helmet to helmet penalty on Robey Coleman

and that Riveron stated "We messed it up."

29.

If the penalties had been called the Saints would have been awarded a first down at the spot of the pass interference foul, an additional penalty of 15 yards (½ distance to the goal) would have been added to the end of the play for the illegal use of helmet and it is possible that the Ram defender would have been ejected from the game. The Saints would have had first down inside the 10 yard line with approximately 1:45 left on the clock with the Rams having only one remaining time out. The Saints could have run the clock down to under 20 seconds before kicking the game winning field goal.

30.

The most obvious effect that was caused by the NFL and the defendants' failure to appropriately and publicly acknowledge, investigate and take appropriate action per their own league rules concerning the intentional non-calls was a violation of fan trust and the very integrity of the game. The man entrusted with the league and game's integrity, GOODELL is the same person who simply ignored the incident while it transpired and as of the date of this filing has failed to take appropriate action.

31.

Instead the only action taken by the league to date occurred on January 25, 2019 when the NFL reported it will fine the Rams defender for the helmet to helmet hit on the Saints receiver Tommylee Lewis. Too little, too late and simply more evidence of the fact that the NFL "system" failed on all accounts at every level at THE GAME on January 21, 2019 in the Superdome.

32.

The circumstances of the timing of the non-call, the overt, the obvious, obnoxious and violent nature of the foul, the universal admission by all involved that the fouls occurred, the existence of rules promulgated by The NFL precisely to address these fouls, the admission by all that the Defendants blew the call and failed to enforce the rules, the NFL's published emphasis to vigilantly call and enforce the rules specific to these fouls and the undeniable and universally admitted fact that the non-call changed the outcome of the game created the perfect storm and are circumstances so unique that this case is unlike any other and provides for the precise situation that Rule 17 was designed to remedy.

## V. CAUSES OF ACTION

### COUNT I: DETRIMENTAL RELIANCE (EQUITABLE ESTOPPEL)

33.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. *La. Civ. Code Art. 1967*.

34.

Detrimental reliance is an equitable remedy in which claimant must prove three elements: (1) a representation by word or conduct; (2) justifiable/reasonable reliance; and (3) a change in position to one's detriment because of the reliance.

### REPRESENTATION BY NFL

35.

In the subject instance, the defendant, the NFL has publicly declared to the world and more

importantly to the fans (including Plaintiffs) that their responsibilities include ensuring that the **rules and the officiating are consistent and fair to all competitors.**[7]

36.

The NFL represents that it goes to great lengths to provide a consistent, fair, and TV and fan friendly product. The NFL declares to the public, including the plaintiffs, in their operations manual that "It's imperative that the games are decided on the field, between the two teams."[8]

37.

Roger Goodell, acting as Commissioner of the National Football League, has repeatedly represented to fans that the game's integrity is paramount and that he is responsible. Roger Goodell has stated publicly on ESPN that "...when it comes to the integrity of the game, that is the commissioner's responsibilities and has been since the day the NFL was formed."[9] GOODELL has publicly stated that "The integrity of the game is the most important thing. The integrity of the game is something we will always protect. The rules apply to everybody. That is my job in particular, to make sure everyone from our players to our coach, to our fans and our partners, that they all recognize we're going to play by these sets of rules, and that's part of our values and

---

[7] Exhibit 2 - https://operations.nfl.com/football-ops/nfl-ops-honoring-the-game/

[8] Exhibit 3 - The NFL Football Operations Manual - "Deciding Games on the Field" https://operations.nfl.com/football-ops/league-governance/

[9] Exhibit 4 http://www.espn.com/nfl/story/_/id/15426767/nfl-commissioner-roger-goodell-defends-power-citing-integrity-game

standards."[10]

38.

Pending a United States Supreme Court decision that could allow states to legalize sports betting, Roger Goodell stated on ESPN radio show that "You don't want to do anything that's going to impact negatively on the integrity of our game", Goodell said. "You want to be certain that there are no outside influences on our game, and that fans don't even have any issue with that; they understand, whether it's a perception or not, that there is no influence on our game. And that's something we stand firmly behind on the integrity of our game." Mr. Goodell further stated that regardless of the Supreme Court's ruling that "...we're going to protect the integrity of the game, I assure you of that."[11]

39.

To further underscore that value allegedly placed on the game, the Commissioner is solely empowered and authorized to take those measures necessary to preserve the integrity of the game.

*NFL Operations Manual Rule 17 Section 2 - Extraordinarily Unfair Acts*[12] states as follows:

> **ARTICLE 1.   COMMISSIONER AUTHORITY**. The Commissioner has the sole authority to investigate and take appropriate disciplinary and/or corrective measures if any club action, non-participant interference, or calamity occurs in an NFL game which the Commissioner deems so extraordinarily unfair or outside the accepted tactics encountered in professional football that such action has a major effect on the result of the game.

---

[10] Exhibit 5
http://www.nfl.com/news/story/0ap3000000507859/article/goodell-integrity-of-game-is-most-important-thing

[11] Exhibit 6
http://www.espn.com/chalk/story/_/id/22265994/nfl-remains-focused-integrity-comes-sports-betting

[12] Exhibit 1

**ARTICLE 2.  NO CLUB PROTESTS**. The authority and measures provided for in this entire Section 2 do not constitute a protest machinery for NFL clubs to avail themselves of in the event a dispute arises over the result of a game. **The investigation called for in this Section 2 will be conducted solely on the Commissioner's initiative to review an act or occurrence that the Commissioner deems so extraordinary or unfair that the result of the game in question would be inequitable to one of the participating teams.** The Commissioner will not apply authority in cases of complaints by clubs concerning judgmental errors or routine errors of omission by game officials. Games involving such complaints will continue to stand as completed.

**ARTICLE 3.  PENALTIES FOR UNFAIR ACTS**. The Commissioner's powers under this Section 2 include the imposition of monetary fines and draft-choice forfeitures, suspension of persons involved in unfair acts, and, **if appropriate, the reversal of a game's result or the rescheduling of a game, either from the beginning or from the point at which the extraordinary act occurred. In the event of rescheduling a game**, the Commissioner will be guided by the procedures specified in 17-1-5–11, above. **In all cases, the Commissioner will conduct a full investigation, including the opportunity for hearings, use of game video, and any other procedure the Commissioner deems appropriate.**  (Emphasis added)

### JUSTIFIABLE/REASONABLE RELIANCE BY THE PLAINTIFFS

40.

The plaintiffs have a justifiable reliance on the representations made by the NFL through their executive and owners as evidenced by the NFL's own words. As previously stated herein, GOODELL has represented that "The integrity of the game is the most important thing. The integrity of the game is something we will always protect. The rules apply to everybody. That is my job in particular, to make sure everyone from our players to our coach, to our fans and our partners, that they all recognize we're going to play by these sets of rules, and that's part of our values and standards." GOODELL represents to the world that his representation that the game will be played by the rules is owed to the fans, which includes the plaintiffs.

41.

The Saints owner, Gayle Benson, who, via her ownership of the Saints, is an NFL

representative issued a statement in response to the events that transpired on January 21, 2019 relevant to the most basic representations made by the NFL (fairness and integrity), the reliance by the fans as to those representations and how that reliance was to the fan's detriment, in part stated as follows[13]:

> "*Yesterday's result is still difficult to accepts for all of us. I am thoroughly disappointed by the events that led to the outcome of yesterday's game. Getting to the Super Bowl is incredibly difficult to do and takes such an unbelievable commitment from a team and support from its fans.* **No team should ever be denied the opportunity to reach the title game (or simply win a game) based on actions, or inaction, of those charged with creating a fair and equitable playing field.** *As is clear to all who watched the game, it is undeniable that our team and fans were unfairly deprived of that opportunity yesterday. I have been in touch with the NFL regarding yesterday's events and will aggressively pursue changes in NFL policies to ensure no team and fan base is ever put in a similar position again.* **It is a disservice to our coaches, players, employees and, most importantly, the fans who make our game possible. The NFL must always commit to providing the most basic expectations - ** <u>**fairness and integrity**</u>* (Emphasis added).

42.

To further evidence the universal truth that the NFL fans, Saints fans and the Plaintiffs reliance on the NFL's representations with regards to officiating and the integrity of the game, one need look no further that the letter written by Louisiana Governor John Bel Edwards letter to Commissioner Goodell[14] wherein he stated in pertinent part:

> "*The very least that* <u>***any fan of the Saints, or any other team, should be able to expect***</u> *from any game is that the* <u>***result will be decided by the players on the field***</u>*.* <u>***By missing the obvious, blatant, and intentional penalty at the end of the game, the referees in Sunday's game undermined that expectation and unfortunately were allowed to determine the winner***</u>*. This team deserves better. Saints fans deserved better. The City of New Orleans and the State of Louisiana deserved better.*

---

[13] Exhibit 7

[14] Exhibit 8

43.

The letter is also evidence that it is known and expected by the NFL fans, including the plaintiffs, that Commissioner GOODELL has the power to right the wrong and exercise his powers per Rule 17 Section 2 Article 3[15]:

> *While it certainly would be within your powers to determine the missed call was so out of bounds that it affected the fundamental fairness of the game (and, without doubt, it was), I do recognize that you are unlikely to change the result of the game. "The very least that any fan of the Saints, or any other team, should be able to expect from any game is that the result will be decided by the players on the field..."*

44.

While *Rule 17, Section 2 Article 2* suggests that the Commissioner will not exercise his authority in instances where a club's complaint is based upon judgmental errors or routine errors of omission made by officials, the incident in question was not judgmental nor routine. The aforementioned admission by the Rams defender, observations by Football experts and novices, the industry, public outcry and NFL's admission and imposition of a fine after THE GAME are evidence that this Honorable Court can take judicial notice that the non-call was not subject to a judgmental error and/or a routine error committed during the course of a game to determine the NFC Champion in the final two minutes of the game where the call would be determinative of the winner of the game. Indeed, it has been stated by experts of the game that what occurred is the "worst" in the history of the NFL.

45.

The NFL's representations that the officiating at THE GAME would be consistent and fair

---

[15] Exhibit 1

to all competitors and that the integrity of the game would be protected by the Commissioner as contemplated by *Rule 17 Section 2 Article 3* is further evidenced by the fact that the Governor of the great State of Louisiana, John Bel Edwards to Commissioner Goodell would take the time to pen a letter addressing the representations made by the NFL, the reliance upon those representations by the fans and how that reliance was to the fans detriment. In fact, Governor Edwards acknowledged that the subject officials conduct and the Commissioner's inaction has called into question the very integrity of the game.

> "*.... By missing the obvious, blatant, and intentional penalty at the end of the game, the referees in Sunday's game undermined that expectation and unfortunately were allowed to determine the winner. This team deserves better. Saints fans deserved better. The City of New Orleans and the State of Louisiana deserved better.*
>
> *While it certainly would be within your powers to determine the missed call was so out of bounds that it affected the fundamental fairness of the game (and, without doubt, it was), I do recognize that you are unlikely to change the result of the game. ........ If the NFL fails to act, the very integrity of the game will be called into question- something that no football fan wants to see.*"

## DETRIMENT

### 46.

The plaintiffs are fans who are aware of and believed that the rules of the game would be enforced and believed that the officials of the game were highly paid professional and trained to, at the very least, make obvious calls that require little, if any, judgment such that the integrity of the game could not be questioned. The plaintiffs would not have purchased a ticket that costs several hundred dollars to THE GAME if such representations were not made and they could not rely upon said representations.

### 47.

The plaintiffs reasonably relied upon the representations made by the NFL and it's

commissioner, GOODELL that the rules of the game and the officiating at THE GAME would be consistent and fair to all competitors and further that in the event of an extraordinary or unfair act or occurrence that pursuant to the NFL Operations Manual Handbook (The "NFL bible" - Rule 17 Section 2 Article 3) the result of the game in question would be inequitable to one of the participating teams that GOODELL would use his vested authority to act and, if appropriate, reverse the game's result and/or rescheduling of the game, either from the beginning or from the point at which the extraordinary act occurred. The aforementioned being the impressive authority reserved unto the Commissioner that would be exercised in the event the integrity of a game is in question.

48.

The plaintiffs would not have purchased a ticket to THE GAME if they could not rely upon the representation that the officials charged with officiating THE GAME and their superiors, including GOODELL and RIVERON would not act in accordance with the rules they promulgate, teach, distribute and are in charge of enforcing and that THE GAME's result would be so unfair to one of the teams that would call into question the integrity of THE GAME.

49.

Further, the subject officials and their superiors, GOODELL and RIVERON's failure to act in accordance with the NFL Operations Handbook Rules calls into question the very integrity of the game for the fans, including the Plaintiffs. In fact, the subject officials "NON CALL" at THE GAME has called players and fans to question all assurances made by the NFL and the Commissioner that the game is fair and not subject to outside influence. The fact that certain officials all reside in Southern California, the same area of the Los Angeles Rams and that not one

official made a call on an unobstructed play that violated multiple NFL rules certainly suggests a scandal exists reminiscent to the 2007 NBA betting scandal that involved an NBA referee, Tim Donaghy, who was gambling on the games he officiated. This question of integrity is the product of the defendants' failure to keep the very promises they made to all NFL fans, all to the detriment of NFL fans, including the plaintiffs. The Plaintiffs want to be reimbursed by the Defendants for the hard earned money that they paid to attend THE GAME that resulted in an unfair and in equitable outcome perpetuated by the very people who were entrusted by the fans, including the plaintiffs, to protect the integrity of the game.

50.

The outcry from fans, players, analysts and coaches has been universal around the country and is evidence that the integrity of the NFL and THE GAME and the outcome of THE GAME was so **unfair that the result of the game in question was inequitable to one of the participating teams as evidenced on social media:**

- Los Angeles Rams own superstar, TODD GURLEY expressed the feelings felt by almost everyone watching the game that the outcome of the game was decided by the officials and not the players. Specifically, TODD GURLEY posed on social media a meme with him and referee, VINOVICH, that suggests the subject officials were his teammates and co-conspirators:



51.

Similar posts on social media echo the unanimous sentiment as to the egregious conduct of the subject officials that cost the Saints the game and promoted the lack of integrity by the defendants at THE GAME:

· NFL Houston Texan superstar, JJ Watt posted on his twitter: "There needs to be some form of accountability. NEEDS to be. (JJWatt@JJWatt);

· Former NFL quarterback and CBS and HBO analyst, Boomer Esiason tweeted: "The @Saints got royally SCREWED! That's what I think. Either PI, defenseless rec or illegal contact should've been called."

· Keenan Allen, current NFL player for the San Diego Chargers tweeted: "Congrats to the Rams and everything. But there's no way these refs can be in the league next season. I can count multiple games where they have dictated the end of the game and it ain't fair. It's out of control and the consequences are...well there is no consequence.

52.

The NFL's own employees, Saints Benjamin Watson has called into question the integrity of the game and GOODELL's failure to take appropriate action or live up to the promises he has

made to the players and fans (including the plaintiffs):

> "Commissioner Goodell. We all realize that football is an imperfect game, played, coached and officiated by imperfect people. What occurred last Sunday in New Orleans though, was outside of that expected and accepted norm. Your continued silence on this matter is unbecoming of the position you hold, detrimental to the integrity of the game and disrespectful and dismissive to football fans everywhere. From the locker room to Park Ave, accountability is what makes our league great. Lead by example. We are waiting."

53.

There is no defense by the defendants that they do not owe a duty to the Plaintiffs. They have publicly time and time again, presumably as a marketing ploy to get fans, represented that they are the guardians of the games' integrity, that the rules will be closely adhered to, followed and enforced and that Commissioner GOODELL will take all measures needed to ensure that the integrity of the game is not compromised. They made promises to fans, including the Plaintiffs; the fans, including the plaintiffs relied upon those promises and to their detriment and paid hundreds of dollars for tickets. The Defendants violated their promises causing harm and damage to Plaintiffs.

54.

The Defendants cannot claim that this is a game filled with human error and this was simply a judgmental call. For those reasons previously cited, the foul did not require analysis, judgment or discretion; they were obvious fouls. Further evidence of this disingenuous defense is that the NFL has eyes everywhere. GOODELL was watching the game. GOODELL has communication to the League Office in New York and the subject officials at all times during the game. The NFL has Game Operations staff members who monitor every contest from a conference room in the NFL's headquarters located in New York, New York. They field calls to address any concerns that

teams or league officials may have with the games, including THE GAME, related to game operations. If the NFL Game Operations staff in New York spots a problem, staff can alert the appropriate contact at the stadium to the issue. The Defendants' violations of the NFL's own rules, coupled with the overt and obvious fouls, further calls into question the integrity of the game and whether outside influences impacted the game.

55.

The defendants blown calls or non-calls and GOODELL's inaction has called into question the integrity of the NFL and THE GAME. There is NO question that there was no integrity displayed by the defendants with regard to the blown calls or non-calls as every person of sound mind and vision saw what transpired for which there is no excuse, defense or alibi for the result. As a result of GOODELL's inaction, refusal to take appropriate action and by allowing the Los Angeles Rams to be crowned as the NFC Champion in light of the inexplicable circumstances that exists as to the subject game, the fans, including the Plaintiffs are left with no other alternatives but to contemplate the following:

- NFL was not able to take action because they fear that the casinos in Las Vegas would take legal action against them if they were to take the authorized actions;

- A official may have been compromised in some manner such that he was coerced and/or that he sought a financial windfall if he were to blow the call;

- The officials involved in the game were from California and felt duress to make the call that they knew would result in a loss to the Rams;

- The NFL and GOODELL preferred the Rams to be victorious to support their efforts to maintain a team in Los Angeles;

25

·      The NFL and GOODELL believed that a Super Bowl involving the Rams would be financially superior to that involving the Saints;

·      GOODELL resents Coach Sean Payton and maintains ill feelings against Payton and the Saints for "bounty gate";

·      "Vegas" dictates the outcome of close games when there is a significant amount of money at stake.

The Defendants' actions and inactions surrounding the game eviscerated Plaintiffs' core belief in the integrity of THE GAME and The NFL and in violation of promises made to Plaintiffs as inducement to purchase tickets.

56.

The circumstances and facts that are the basis of this suit are not routine and not simply fan dissatisfaction with the outcome of the game. The circumstances and facts that are the basis of this suit present "the perfect storm" that does present viable causes of action that are not based merely upon the license granted by a ticket but rather are based upon public representations made repeatedly to the plaintiffs that they relied upon when they purchased their ticket. Specifically, **the rules would be vigorously enforced and where an extraordinary or unfair occurrence took place where the result of the game in question would be inequitable to one of the participating teams that those in charge of preserving the integrity of the game would reverse the game's result or   reschedule the game, either from the beginning or from the point at which the extraordinary act occurred.**

57.

The NFL and GOODELL have made repeated representations to the Plaintiffs prior to THE

GAME that the integrity of the game would be not be compromised and that they would not allow for a result that would be so inequitable to one of the participating teams. In this instance not only did the NFL and GOODELL allow it to take place, they created the inequitable result and then allowed it to stand thus failing to keep their promises to the Plaintiffs.

58.

The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. The facts and circumstances that are the basis of this subject suit clearly fit into the doctrine of detrimental reliance.

59.

As a result of the defendants' breach of their promises, the Plaintiffs seek all expenses incurred or the damages suffered as a result of their reliance on the promise to include the following:

a.      Cost of the ticket to attend THE GAME;

b.      Cost to park to attend THE GAME;

c.      Cost to travel to THE GAME, including transportation, fuel, hotel and meals;

d.      Cost of concessions and merchandise purchased at THE GAME

**COUNT II - NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATION**

60.

The Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

61.

A party may recover in tort for purely economic losses caused by negligent misrepresentation (and certainly intentional misrepresentation), even where privity of contract is absent. *LSA-C.C. Art. 2315, 2316, Barrie v. V.P. Exterminators, Inc., et al.*, 625 So.2d 1007 (La. 1993).

62.

Case by case employment of the duty/risk analysis is appropriate standard for determining legal responsibility for negligent misrepresentations.

63.

Louisiana employs the foreseeability test in determining whether a duty is owed by the Defendants to these Plaintiffs. The foreseeability view allows recovery to third parties "to the extent that damages incurred by non-clients are reasonably foreseeable. Liability under this rule extends to all reasonably foreseeable plaintiffs, who, as a result of their actual and justifiable reliance on negligently made representations, suffer economic damages.

64.

For those reasons set forth herein, the economic damages that the Plaintiffs incurred, namely the cost of the ticket, parking costs, concession costs, costs for travel, and meals resulting from the Defendants' failure to adhere and comply with the rules and their prior representations was reasonably foreseeable.

65.

Specifically, the defendants owed a duty to the Plaintiffs. The Defendants solicited Plaintiffs as fans and to purchase tickets, and other incidental items all for the purpose of enriching

themselves all the while promising that the integrity of their game is beyond reproach and all measures would be taken by them to ensure that integrity is never compromised. Specifically the defendants promised that illegal helmet to helmet contact would not be permitted and fouls would be called to enforce same, that illegal contact will be more strictly enforced this season; that offensive and defensive pass interference will also be strictly enforced, they promised that the rules and the officiating would be consistent and fair to all competitors; that the integrity of the game is something they will always protect; that the rules apply to everybody; that it is GOODELL's job in particular, to make sure everyone from our players to our coach, to **our fans** and our partners that they all recognize that the NFL games are going to be played by these sets of rules and that's part of The NFL's values and standards.

66.

Based upon those promises, the Plaintiffs purchased tickets to witness a Championship Game that was represented not only as a contest between the two best teams in the National Football Conference of the NFL but that the officials officiating the game would be an All-Star Crew of the highest caliber.

67.

The Plaintiffs purchased tickets and other incidental items all as a result of these promises. The Defendants failed extraordinarily on its promises and misrepresentations. Specifically, the NFL, GOODELL and RIVERON were negligent in their representations and/or intentional in their misrepresentations to the Plaintiffs in the following non-exclusive manners:

    a.      Failing and/or refusing to properly train and educate the subject officials with respect to the rules of the game such that illegal helmet to helmet contact would not

be permitted and fouls would be called to enforce same, that illegal contact fouls would be enforced, that defensive pass interference would be strictly enforced, to ensure that the rules and the officiating are consistent and fair to all competitors; to ensure that the integrity of the game is protected; that the rules apply to everybody;

b.    Allowing untrained officials to officiate THE GAME such that it made it probable that illegal helmet to helmet contact would be permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

c.    Failing and/or refusing to ensure that the subject officials were unbiased with respect to the Saints, their players, coaches and fans and were objective officials prior to instructing them to officiate THE GAME such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

d.    Failing and/or refusing to perform the proper background checks of the subject officials prior to allowing them to officiate THE GAME to ensure that they were not biased and/or prejudiced such that they could officiate THE GAME without bias or prejudice such that it made it probable that illegal helmet to helmet contact

was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

e.      Failing and/or refusing to interview and/or interrogate the subject officials to ensure that they were not under duress, threatened or coerced in any manner that would interfere with their ability to officiate in a professional, fair, objective and unbiased manner such that it made it probable that illegal helmet to helmet contact was permitted; that  illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game is not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

f.      Failing and/or refusing to properly supervise the subject officials as to their duties, obligations and responsibilities prior to commencement of THE GAME such that they could perform their job in a prudent manner such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game is not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

g.  Failing and/or refusing to properly supervise the NFL Operations department in New York who was monitoring the game as to their duties, obligations and responsibilities prior to commencement and/or during THE GAME such that they could perform their job in a prudent manner such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

h.  Failing and/or refusing to act in accordance with their own published and promulgated rules and representations to ensure that illegal helmet to helmet contact would not be permitted and fouls would be called to enforce same, that illegal contact would be enforced, that defensive pass interference would be strictly enforced, to ensure that the rules and the officiating were consistent and fair to all competitors; to ensure that the integrity of the game was protected; that the rules apply to everybody;

i.  Failing to communicate with the subject officials immediately after the subject play that gives rise to this suit to address an obvious injustice and take appropriate measures and/or action such that the integrity of THE GAME would not be questioned and patently unfair result would not occur;

j.  Failing to communicate with each other immediately after the subject play that gives rise to this suit to address an obvious injustice and take appropriate measures

such that the integrity of THE GAME would not be questioned and a patently unfair and extraordinary result would not occur;

k. Failing to conduct the appropriate medical examinations and/or inquiries into medical conditions of the subject officials, including but not limited to eye examinations and mental examinations such as to ensure their physical and mental capability to ensure illegal helmet to helmet contact would not be permitted and fouls would be called to enforce same, that illegal contact would be enforced, that defensive pass interference would be strictly enforced, to ensure that the rules and the officiating were consistent and fair to all competitors; to ensure that the integrity of the game was protected; that the rules apply to everybody;

l. GOODELL's failing to promptly and thoroughly investigate the incident that was so extraordinary or unfair that the result of the game in question would be inequitable to one of the participating teams; and

m. Other acts that may be identified during the course of discovery.

68.

The Plaintiffs purchased tickets and other incidental items as a result of these promises. The Defendants extraordinarily violated their promises and representations. Specifically, VINOVICH, TURNER and CAVALETTO were negligent in their duties resulting in the NFL, GOODELL and RIVERON's negligent misrepresentations and/or intentional misrepresentations to the Plaintiffs in the following non-exclusive manners:

a. Failing to properly train and/or learn the rules that they are given the power to apply at THE GAME;

b.      Negligently and/or intentionally ignoring multiple fouls that were committed by the Rams defender during the subject play that is the subject of this lawsuit that would have materially altered the outcome of the subject game;

c.      Failing and/or refusing to communicate to their employer that they were biased with respect to the Saints, their players, coaches and/or fans such that it made it probable that they would not call a foul for illegal helmet to helmet; or illegal contact or defensive pass interference; that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

d.      Failing and/or refusing to communicate to their employer that they were biased and/or prejudiced such that they could not officiate THE GAME without bias or prejudice such that it made it probable that they would not call a foul for a violation of the applicable rules such that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the NFL's promised values and standards;

e.      Failing and/or refusing to communicate to their employer and/or immediate supervisors that they were under duress, threatened or coerced in any manner that interfered with their ability to officiate in a professional, fair, objective and

unbiased manner such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference was not enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

f.     Failing and/or refusing to follow the rules of the game such that they could perform their job in a prudent manner, such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

g.     Failing and/or refusing to properly communicate with the NFL Operations department in New York that was monitoring the game as to their duties, obligations and responsibilities prior to commencement and/or during THE GAME such that they could perform their job in a prudent manner, such that it made it probable that illegal helmet to helmet contact was permitted; that illegal contact was not enforced; that defensive pass interference would not be enforced, that the rules and the officiating would not be consistent and fair to all competitors; such that the integrity of the game was not protected and such that the rules did not apply to everybody in accordance with the promised values and standards;

h.      Failing and/or refusing to act in accordance with the NFL's own published and promulgated rules to ensure that illegal helmet to helmet contact would not be permitted and fouls would be called to enforce same, that illegal contact would be enforced, that defensive pass interference would be strictly enforced, to ensure that the rules and the officiating were consistent and fair to all competitors; to ensure that the integrity of the game was protected and that the rules applied to both teams;

i.      Failing to communicate with GOODELL and/or RIVERON immediately after the subject play that gives rise to this suit to address an obvious injustice and take appropriate measures and/or action such that the integrity of THE GAME would not be questioned and patently and extraordinarily unfair result would not occur;

j.      Failing to communicate with each other immediately after the subject play that gives rise to this suit to address an obvious and extraordinarily injustice and take appropriate measures such that the integrity of THE GAME would not be questioned and patently and extraordinarily unfair result would not occur;

k.      Failing to reveal to their employers and/or supervisors results of any medical examinations and/or inquiries into their medical conditions, including but not limited to eye examinations and mental examinations to ensure their physical and mental condition would not impair their ability to call appropriate fouls, including illegal helmet to helmet contact, illegal contact, defensive pass interference and that the rules would be strictly enforced so as to ensure that the rules and the officiating was consistent and fair to all competitors; and to ensure that the integrity of the game was protected and that the rules applied equally to both teams;

l.      CAVALETTO's negligent and/or intentional act of disregarding multiple fouls committed in his plain and unobstructed view and refusing to call a foul for any of the multiple fouls including illegal helmet to helmet contact, illegal contact, defensive pass interference and contact of a player in a defenseless posture;

m.      CAVAELTTO's negligent and/or intentional act of calling off TURNER as TURNER was approaching him to throw a flag causing further question as to the integrity of the non-call and game;

n.      CAVALETTO'S failure and/or refusal to call for a huddle and communication with TURNER and/or VINOVICH so as to address any concern with the non-call;

o.      CAVALETTO's inexplicable failure to see what 73,000 people in the stadium witnessed and another 45 million viewers witnessed with regards to the subject play that forms the basis of this lawsuit which further calls into question the integrity of the NFL, its executives and officials and most of all CAVALETTO;

P.      TURNER's negligent and/or intentional failure and/or refusal to throw a flag and call the multiple fouls he witnessed in his plain and unobstructed view, including illegal helmet to helmet contact, illegal contact, defensive pass interference and contact of a player in a defenseless posture;

q.      TURNER's failure to call for a huddle will fellow officials to discuss the fouls he had just witnessed so that at the very least he could speak with VINOVICH so he could resolve any differences between him and CAVALETTO;

r.      VINOVICH's failure and/or refusal to take appropriate and prudent action immediately after the play occurred, including calling a foul so that at the very least

he could call for an instant replay review and/or contact RIVERON to discuss the events that just transpired on the field and seek guidance so as to avoid the worst call or non-call in the history of the NFL;

s.     Other acts that may be identified during the course of discovery.

69.

As a result of the defendants negligent and/or intentional acts in violation of the duty owed the Plaintiffs, the Plaintiff on behalf of himself and those similarly situated seeks all expenses incurred or the damages suffered as a result of their reliance on the promise to include the following:

a.     Cost of the ticket to attend THE GAME;

b.     Cost to park to attend THE GAME;

c.     Cost to travel to THE GAME, including transportation, fuel, hotel and meals;

d.     Cost of concessions and merchandise purchased at THE GAME

**COUNT III: BREACH OF FIDUCIARY DUTY**

70.

The Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

71.

The NFL and GOODELL owe a fiduciary duty to the fans of the NFL. GOODELL has admitted as much on several occasions as he has declared on multiple occasions that he is the "gatekeeper" for the integrity of the game and he owes a duty to the fans to preserve, protect and defend the integrity of the game. The integrity of the game includes that the rules and the officiating

would be consistent and fair to all competitors; such that the integrity of the game is protected and such that the rules apply to everybody in accordance with the promised values and standards and that appropriate action will be taken so that the NFL will not allow an occurrence that is so unfair that the result of the game in question would be inequitable to one of the participating teams.

72.

The remaining defendants, VINOVICH, TURNER, CAVALETTON AND RIVERON acting in the course and scope of their employment, are also obligated to perform their jobs so as to ensure that the fiduciary duty owed to the Plaintiffs is not breached.

73.

For those reasons set forth and described herein, the defendants knowingly and willingly acted in concert and participated in the breach of the fiduciary duty owed to the Plaintiffs.

74.

As a result of the defendants' breach of fiduciary duty owed to the Plaintiffs, the Plaintiffs on behalf of themselves and those similarly situated seek all expenses incurred or the damages suffered as a result of their reliance on the promise to include the following:

a.      Cost of the ticket to attend THE GAME;

b.      Cost to park to attend THE GAME;

c.      Cost to travel to THE GAME, including transportation, fuel, hotel and meals; and

d.      Cost of concessions and merchandise purchased at THE GAME.

**COUNT IV: UNJUST ENRICHMENT**

75.

The Plaintiffs reallege and incorporate by reference as though fully set forth herein each

and every allegation contained in the preceding paragraphs.

76.

The elements of an unjust enrichment claim are: (1) an enrichment of the defendant; (2) an impoverishment of the plaintiff; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) there must be no other remedy at law available to Plaintiffs.

77.

Plaintiffs plead unjust enrichment in the alternative to the extent and in the event this Honorable Court would find that there is no other remedy at law available to the Plaintiffs.

78.

Plaintiffs contend that the elements of unjust enrichment are met as follows:

a.      The defendants were enriched by the sale of over 73,000 tickets resulting in excess of $16,000,000 in ticket sales in addition to any and all revenue collected from concessions, merchandise sales, advertising revenue, and parking revenue. In addition to the revenue the NFL receives the remaining defendants all derive salaries, bonuses and benefits that are directly connected to the sales of game tickets to the Plaintiffs.

b.      The plaintiffs have been impoverished financially for the expenses incurred in attending and viewing THE GAME.

c.      The aforementioned describe the connection between the enrichment and resulting impoverishment.

d.      The plaintiffs purchased the tickets based upon representations made by the

defendants that the game would be a fair contest and not "rigged" and that fouls would be called so that one team to have a distinct advantage against another due to the action or inaction of the Defendants.

e.  The plaintiffs reiterate the facts as plead herein that set forth an absence of justification or cause for the enrichment and impoverishment. In fact, one of the NFL's own, the owner of the Saints, Gayle Benson stated in her letter:

> *"....no team should ever be denied the opportunity to reach the title game (or simply win a game) based on the actions, or inactions, of those charged with creating a fair and equitable playing field. As is clear to all who watched the game, it is undeniable that our team and fans were unfairly deprived of that opportunity yesterday.....it is a disservice to our coaches, players, employees and, most importantly, the fans who make our game possible. The NFL must always commit to providing the most basic of expectations- fairness and integrity.*[16]

79.

The plaintiffs are entitled to damages for the unjust enrichment of the defendants to the full extent of that unjust enrichment that would include the following:

a.  Cost of the ticket to attend THE GAME;

b.  Cost to park to attend THE GAME;

c.  Cost to travel to THE GAME, including transportation, fuel, hotel and meals; and

d.  Cost of concessions and merchandise purchased at THE GAME.

**COUNT V: CONSPIRACY AND SOLIDARY LIABILITY**

80.

The Plaintiffs reallege and incorporate by reference as though fully set forth herein each

---

[16] Exhibit 7

and every allegation contained in the preceding paragraphs.

81.

The wholesale abandonment of the NFL's own rules coupled with the overt, obnoxious, obvious and vicious fouls suggests Defendants did conspire to commit the actionable causes of action included herein. Specifically the NFL employees, the defendants, GOODELL, VINOVICH, TURNER, CAVALETTO and RIVERON agreed, either pregame or thereafter, to ignore obvious fouls in violation of the game's rules and eviscerate all integrity of the game which was so unfair that the result of the game in question was inequitable to the Saints and the failure to take any measures or actions within their power to correct same further corroborates a conspiracy between the Defendants.

## CLASS ACTION REQUISITES

## I. NUMEROSITY

82.

The Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

83.

The class is defined as each person purchasing a ticket (and other items as previously identified) to attend THE GAME as defined herein. Based upon information and belief herein the number of tickets purchased is approximately 73,000. Thus, the number of members is so impracticable as to entertain 73,000 separate suits.

## II. QUESTIONS OF LAW OR FACT COMMON TO THE CLASS

### 84.

The facts surrounding the circumstances that give rise to the causes of actions alleged herein are common as to all plaintiffs. As alleged herein the plaintiffs are limited to ticket holders for THE GAME and that the representations, actions and/or inactions committed by the defendants that give rise to the suit are uniform as to all Plaintiffs. Further, the enumerated damages as itemized herein are common as to all plaintiffs. Finally, the law to be applied with regards to each claim will be common as to all plaintiffs since the causes of action plead are universal as to all plaintiffs.

## III. CLAIMS AND DEFENSES OR THE REPRESENTATIVE PARTIES ARE TYPICAL OF THE CLAIMS OR DEFENSES OF THE CLASS

### 85.

For those reasons set forth in paragraph 81 the claims and defenses of the representative parties are typical of the claims or defenses of the class.

## IV. THE REPRESENTATIVE PARTIES WILL FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS

### 86.

The plaintiffs are David and Barbara Ryan who will fairly and adequately protect the interest of the class.

## V. THE CLASS IS DEFINED IN TERMS OF ASCERTAINABLE CRITERIA

### 87.

The class are those persons who purchased a ticket to THE GAME and are limited in scope such that the court may determine the constituency of the class for purposes of the conclusiveness

of any judgment that may be rendered in the case.

## PRAYER

WHEREFORE, Plaintiffs pray, on their behalf and on behalf of similarly situated plaintiffs that the defendants, **NATIONAL FOOTBALL LEAGUE, INC, ROGER GOODELL, WILLIAM VINOVICH, III, PATRICK TURNER, GARY CAVALETTO and ALBERTO RIVERON** be served with a copy of this Petition and be cited to appear and answer same and after a lapse of all legal delays and proceedings, that there be judgement in favor of Plaintiffs, and against defendants, **NATIONAL FOOTBALL LEAGUE, INC, ROGER GOODELL, WILLIAM, VINOVICH, III, PATRICK TURNER, GARY CAVALETTO AND ALBERTO RIVERON,** severally, jointly and in solido, for all damages, general, special and exemplary damages allowed by law, for which this Honorable Court finds reasonable, together with legal interest thereon from date of judicial demand until paid, for all costs of these proceedings and for other general, equitable and specific relief, to which Plaintiffs may be entitled.


Respectfully submitted by:

/s/Clé Simon_____
Clé Simon (19996)
Simon Law Offices
122 Representative Row
P.O. Box 52242
Lafayette, Louisiana 70505
Telephone: 337.232.2000
Facsimile: 337.234.9274
Email: cle@simonlawoffices.com
Attorney for the Plaintiffs

/s/Kevin R. Duck_____
Kevin R. Duck (23043)
Duck Law Firm, L.L.C.
5040 Ambassador Caffery Parkway, Ste. 200
Lafayette, Louisiana 70508
Telephone: 337.406.1144
Facsimile: 337.406.1050
Email: krd@ducklawfirm.com
Attorney for the Plaintiffs